J-A01008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANWAR WOODS | |
| Appellant | No. 2843 EDA 2014 |

Appeal from the Judgment of Sentence September 2, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008421-2013

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED FEBRUARY 18, 2016**

In this direct appeal, Appellant Anwar Woods challenges the denial of his motion to suppress evidence that he unlawfully possessed a firearm in his car.  Convicted of Persons Not to Possess Firearms, Possession of a Firearm with Altered Manufacturer's Number, Firearms Not to Be Carried without a License, and Carrying Firearms on Public Streets in Philadelphia,[1] Appellant was sentenced to an aggregate term of five to ten years' incarceration.  He asserts that both documentary and testimonial evidence impeached the credibility of investigating officers and, thereby, exposed a purely pretextual cover story meant to conceal a racially-based motive for the stop and search.  Appellant grossly overstates the probative value of his

_____

[1] 18 Pa.C.S.A. §§ 6105, 6110.2, 6106, and 6108, respectively.

*Former Justice specially assigned to the Superior Court.

evidence, which failed to reveal an unlawful basis to the investigation. Accordingly, discerning no manifest error in the suppression court's credibility determinations, we affirm.

The trial court provides an apt procedural and factual history that we adopt for purposes of conducting appellate review:

> On July 2, 2014, Appellant unsuccessfully litigated a Motion to Suppress Physical Evidence. On September 2, 2014, following a stipulated bench trial before [the trial court], Appellant was convicted of [the above-referenced charges]. On the same date, upon review of the pre-sentence investigation report and consideration of all relevant facts and circumstances of this case, [the trial court sentenced] Appellant to an aggregate term of five (5) to (10) years' incarceration. Appellant filed a timely Post-Sentence Motion for Reconsideration, which [the trial court] denied on September 4, 2014. Appellant subsequently appealed, and [the trial court] ordered him to file a Concise Statement of Matters Complained of on Appeal in accord with Pa.R.A.P. 1925(b). Counsel for Appellant timely complied.
>
> The sole focus of this appeal concerns the July 2, 2014, ruling on Appellant's Motion to Suppress. At the suppression hearing, Appellant contended that police lacked probable cause first to stop, and then search, his vehicle. The Commonwealth presented the testimony of Philadelphia Police Officer Charles Waters. Officer Waters testified that, on June 6, 2013, at approximately 7:13 p.m., he was on patrol with his partner, Officer Antoinne Wesley, in the vicinity of 1500 North 29[th] Street in Philadelphia. At said time and location, Officer Waters observed Appellant driving southbound on 29[th] Street in a white 2013 Dodge Charger, and speeding up to a yellow light, which changed to red. Officer Waters ran Appellant's license plate through the NCIC database, which came back as belonging to a Ford, not a Dodge. He then effected a traffic stop of Appellant's vehicle. [N.T. Suppression, 7/2/14, at 4-6].
>
> Officer Waters testified that he approached Appellant's driver's side window and asked him to produce his license and registration. When Appellant opened the center console to retrieve the above items, Officer Waters observed a black and silver handgun. He immediately yelled "gun" to his partner, who

- 2 -

recovered the weapon. Officer Waters—who had been a police officer for 16 years and recovered more than 200 handguns—testified, "I saw the handle of the gun and the top part of it. . . . I knew it was a firearm. I see firearms every day." Officer Waters further testified that Appellant's driver's license came back as suspended, and while they came to learn the vehicle in question was a rental, Appellant could not produce the rental paperwork. Accordingly, the officers "Live Stopped"[2] Appellant's vehicle. [N.T. at 7-12][fn]

---

[fn] At the time of the stop, a young child age three (3) or four (4) was present in the back seat of Appellant's car. Prior to being taken into custody, Appellant requested the officers to call his girlfriend, who was the mother of said child. A few minutes later, the child's mother arrived at the scene and took the child into custody. [N.T. at 7, 12-13].

---

[2] The "live stop" practice for removing a vehicle from a public street when the driver is not properly licensed provides, in relevant part, as follows:

**Immobilization, towing and storage of vehicle for driving without operating privileges or registration**

**(a) General rule.**—Subject to subsection (d), the following shall apply:

(1) If a person operates a motor vehicle or combination on a highway or trafficway of this Commonwealth while the person's operating privilege is suspended, revoked, canceled, recalled or disqualified or where the person is unlicensed, as verified by an appropriate law enforcement officer in cooperation with the department, the law enforcement officer shall immobilize the vehicle or combination or, in the interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storage agent pursuant to subsection (c), and the appropriate judicial authority shall be so notified.

75 Pa.C.S.A. § 6309.2(a)(1).

The Commonwealth next called Officer Antoinne Wesley to the stand. Officer Wesley [corroborated the testimony of Officer Waters, adding that the gun was loaded with five rounds and bore an obliterated serial number].

Appellant presented the testimony of Gwendolyn Bell, who was his girlfriend, and the mother of the child in Appellant's car. Ms. Bell testified that she arrived on the scene as the stop *was being effected*. . . . According to Ms. Bell, the officers took Appellant's information, walked to their patrol car, returned to Appellant and said, "Put your fucking hands up." She testified that Appellant then got out of the car and they searched him and then the car [for seven or eight minutes before retrieving], the gun. [N.T. at 38-48].

Appellant also presented the testimony of Tiara Meadows, his wife. Ms. Meadows testified that, 11 days prior to the incident, she was driving with Appellant in a Dodge Charger, and the same two police officers stopped them on the same basis, *i.e.*, that the license plate did not match the vehicle. According to Ms. Meadows, the officers had them exit the vehicle, and they searched it, but did not find anything, and let them go. N.T. at 57-60.

Trial Court Opinion, filed February 17, 2015, at 1-4.

Appellant raises the following issue for our review:

**DID THE TRIAL COURT ERR BY DENYING APPELLANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE?**

Appellant's brief at 4.

When reviewing a trial court's order denying a suppression motion, our standard of review is well-settled:

In reviewing a suppression ruling, we are bound by the suppression court's factual findings, unless they are without support in the record. We may reverse the legal conclusions reached by the suppression court, however, if they are in error. Thus, our standard of review of the legal conclusions reached by the suppression court is *de novo.* Where, as here, the defendant is appealing the ruling of the suppression court, we consider only

the evidence of the prosecution, and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the [suppression] record.

*Commonwealth v. Galvin*, 603 Pa. 625, 645, 985 A.2d 783, 795 (2009) (citations omitted).

Additionally, "[i]t is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa.Super. 2013) (citation omitted). "As we believe that credibility at a suppression hearing is an important determination best resolved through the court's personal observations, we will not reverse a suppression court's assessment of credibility absent clear and manifest error." *Commonwealth v. Camacho*, 625 A.2d 1242, 1245 (Pa.Super. 1993). With regard to our scope of review in the context of an order denying a suppression motion, we are limited to reviewing only the evidence that was presented at the suppression hearing. *See In re L.J.*, 622 Pa. 131, 142-150, 79 A.3d 1073, 1083–87 (2013).

The suppression court made findings of fact fully crediting the officers' testimonies that they stopped Appellant for driving through a red light and operating a vehicle bearing a license plate registered to another vehicle. The NCIC database-check supplying probable cause for the license plate violation, the court opined, was a procedure customarily performed by investigating officers, and it supported further investigation, particularly

when combined with Appellant's inability to produce papers demonstrating either the validity of the plate or his rightful possession of the car. Also persuading the court as to the legitimacy of the stop and search were the officers' written reports recording their field observations and reliance on the NCIC results without equivocation. In short, there was simply no reason brought to the court's attention, the court concluded, for it to believe the officers had invented pretexual explanations in order to disguise a racially-based motive to stop and search Appellant's car.

Neither documentary nor testimonial evidence offered by the defense reveal manifest error with the trial court's credibility determination. Documentary evidence consisting of the Avis rental agreement, which verified Appellant's rental of the car and the validity of the license plate number, and a PennDOT Vehicle Record Abstract, which matched the license plate number to Appellant's rental car, did not, as Appellant contends, belie the officers' testimony about the NCIC results they obtained. The PennDOT abstract for the car indicates a "Title Date" of June 6, 2013. Accordingly, the earliest date on which the abstract itself theoretically could have been created was June 6, 2013—the day of the stop. Appellant supplied no evidence as to either the actual date on which the PennDOT generated the abstract or, more importantly, the date on which the NCIC database would have first reflected the information in the abstract. Appellant cannot meet his burden on such an incomplete record. As for the Avis rental agreement,

evidence established that the officers were not privy to it or the leasing and license plate information it contained, so it, too, was of dubious value to the suppression court in assessing credibility.

Ms. Bell and Ms. Meadows testified regarding facts and circumstances of the stop, but their testimonies were subject to contradiction during the suppression hearing. Specifically, Ms. Bell, Appellant's girlfriend, described witnessing a seven or eight-minute search of the vehicle before officers uncovered a handgun, but officers described observing the handgun very early in the stop when Appellant reached in the console to retrieve his license and registration. Nor was Ms. Bell even at the scene, Officer Waters testified, when officers discovered the gun. Only after officers placed Appellant under arrest and telephoned Ms. Bell on Appellant's request so that she could collect her young child did she arrive. N.T. at 12, 19-20.

Ms. Meadows, Appellant's wife, testified she was Appellant's passenger when the same officers stopped him on a prior day for improper tags on a different rental car, checked his license and registration, and searched the car before releasing them. N.T. at 60, 61, 22. On cross-examination conducted prior to Ms. Meadows' testimony, however, Officer Waters denied ever seeing or stopping Appellant before the June 6, 2013, stop.[3] In each

_____

[3] Redirect examination of Officer Waters developed an important inconsistency—if not direct contradiction—between Ms. Meadows' and Officer Waters' respective testimonies regarding the officer's treatment of a
*(Footnote Continued Next Page)*

instance of conflicting testimony, the suppression court exercised its discretion to credit the officers' accounts over those of Ms. Bell and Ms. Meadows.

As noted above, we may only consider so much of the evidence for the defense that remains uncontradicted when fairly read in the context of the record, *Galvin*, *supra*, and so we may not consider Ms. Bell's or Ms. Meadow's testimony in assessing whether the trial court committed a clear and manifest error in making its credibility determinations. Accordingly, Appellant's challenge must fail.

Judgment of sentence is AFFIRMED.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/18/2016

---

*(Footnote Continued)* ——————

suspended license. In describing the events of the alleged stop occurring eleven days prior, Ms. Meadows said officers checked Appellant's driver's license and released him without penalty. N.T. at 60. Just eleven days later, it is undisputed that Officer Waters checked Appellant's driver's license and issued a traffic citation for driving with a suspended license. N.T. at 11-12, 24-27.